IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>DAVID R. DINGESS,<br>　　　　　Debtor | Chapter 13<br><br>Case No. 20-12986 (BLS) |
| MELODY OLSEN,<br>　　　　　　　　Plaintiff,<br>　　　v.<br><br>DAVID R. DINGESS,<br>　　　　　　　　Defendant. | Adv. Pro. No. 21-50198 (BLS) |

## MEMORANDUM OPINION

Before the Court is a Complaint filed by plaintiff Melody Olsen ("Melody")

asking the Court to determine that her claim against debtor and defendant David

Dingess ("David" or "Debtor") is non-dischargeable under Bankruptcy Code

§ 1328(a)(4).[1]  David filed an Answer, Affirmative Defenses, and Counterclaims in

Response to the Plaintiff's Amended Complaint.[2]  Melody filed an answer to the

Debtor's counterclaim.[3]  A full-day trial was held on February 20, 2025, followed by

---

[1] The original complaint was amended on December 9, 2021, and is filed at Adv. Docket No. 21 (the "Complaint"). The Complaint asks the Court to determine that the Plaintiff's claim against the Debtor is nondischargeable under either § 523(a)(3), (a)(6) or § 1328(a)(4).

[2] Adv. Docket No. 17.

[3] Adv. Docket No. 22.

closing arguments on March 11, 2025.  Following trial, the Court took the matter
under advisement.

In short, Melody's claim in this Chapter 13 case arises from injuries she
sustained during an altercation involving David, his wife Melinda (who is Melody's
daughter), and Melody at David's home that happened on February 26, 2011 (as
described in more detail below, the "Incident").  Melody and her daughter went to
the hospital after the Incident, and David was arrested that night and charged
with assault and disorderly conduct. Later, Melody obtained a default judgment
against David in the amount of $287,557.33 in a personal injury action she filed in
the Superior Court of Delaware. The Complaint before this Court alleges that the
default judgment arises from David's willful and malicious actions that caused
personal injury to Melody and therefore should not be discharged in David's
Chapter 13 bankruptcy case.

For the reasons stated herein, the Court cannot conclude that the injuries
resulted from David's willful or malicious actions and, therefore, Melody's
judgment may be discharged under § 1328(a) upon completion by David of all
payments under his Chapter 13 plan.

<u>FACTS</u>

At trial, the Court heard testimony from Melody, David, and Cassandra
Dingess, the Debtor's daughter and Melody's granddaughter ("Cassandra").  The

parties stipulated to admission into evidence of Plaintiff's Exhibits 1 – 23e and Defendant's Exhibits 1-5.[4]

1. <u>The Incident</u>

At trial, each witness's testimony recounted the events of that night from their own recollection and point of view. And, despite some important differences (which will be discussed in more detail below), the record reflects that all three witnesses agreed upon the following facts:

On the evening of February 26, 2011, the Dingess family (consisting of David, Melinda, and Cassandra) were at home having dinner.[5] During dinner, Melinda started arguing with David.[6] While they were arguing, Melinda headed toward the main bedroom and David followed her.[7] Melinda called her mother (Melody) in tears from the bedroom and asked Melody to come and get her.[8]

While in the bedroom, David and Melinda argued about whether she could take the couple's bank card or other belongings with her.[9] David testified that he did not want her to have the bank card because, in the past, she had overspent money in their account while having an episode.[10] Melody testified that she heard the couple arguing in the bedroom when she arrived, but she could not enter the

---

[4] Transcript (Feb. 20, 2025) (hereinafter "Tr.") at 176:22-177:5.

[5] Tr. 101:22-102:8 (David); Tr. 179:3- 180:10 (Cassandra).

[6] Tr. 103:25-104:9 (David) ("[A]ll of a sudden . . . [s]he just exploded on us and started throwing stuff and just in one of her rages."); Tr. 180:14-18 (Cassandra) ("[M]y mom always would start arguments. They had an argument about something. They were fighting. I tried to ignore it."). There was unrebutted testimony on the record by both David and Cassandra that Melinda suffered from a serious mental health condition that sometimes resulted in emotional and physical outbursts. Tr. 119:22-120:13 (David); Tr. 185:17-24 (Cassandra).

[7] Tr. 104:6-19 (David).

[8] Tr. 18:4-23 (Melody).

[9] Tr. 104:20-105:12 (David).

[10] *Id.*

bedroom because David was in the doorway.[11]  Melody said that she called out to Melinda and told her to just get whatever medication she needed and a change of clothing so they could leave together.[12] Melody testified that Melinda ducked under David's arm to get out of the bedroom and headed down the hallway away from the bedroom.[13]

When Melinda left the bedroom, she headed into the living room and took the family's laptop from Cassandra.[14] David and Melinda started arguing over whether Melinda could take the laptop.[15]  David testified that the family had one laptop that they shared.[16]  Cassandra testified that David wanted to prevent Melinda from taking the laptop because Melinda most likely would have "smashed it."[17]

---

[11] Tr. 19:2-9 (Melody). Melody showed the Court the location of various rooms in the house on a diagram and it is uncontested that all of the rooms were on the same level.  Tr. 20:7-23:15 (Melody).

[12] Tr. 26:12-19 (Melody).

[13] Tr. 27:8-17 (Melody).  David testified that he did not recall Melody anywhere near the bedroom at this time, but - when he followed Melinda out of the bedroom – he noticed Melody had arrived and was standing near the front door in the living room.  Tr. 105:21-106:5 (David).

[14] Tr. 28:1-10 (Melody); Tr. 106:23-107:12 (David).

[15] Tr. 107:6-12 (David).

[16] Tr. 107:22-108:1 (David).

[17]   Q:  And so, tell me, who was arguing over the laptop and where are we talking about?
A: I know the big part of it was in the kitchen/dining room area.  My mom and dad were, they came from . . . the bedroom to the dining room area and they were fighting.  They were pulling over it [the laptop] - - that was just it - - because my mom, 100 percent, would have slammed it.  That's what she was going for.  And they were just tugging for it.
Q:  Okay.
THE COURT:  Hang on.  I'm sorry.  I missed a portion.
THE WITNESS:  Yes?
THE COURT:  They were pulling it and you said, A hundred percent my mother - -
THE WITNESS: Oh, she would have smashed it.  That's her MO.
Tr. 181:21-182:11 (Cassandra).

David tried to grab the laptop back from Melinda and the two started physically "playing tug-of-war" over the laptop.[18]  As they were struggling over the computer, David and Melinda moved from the living room area toward the kitchen area.[19]  At some point, Melinda fell and David was standing over her, both of them still holding onto the computer.[20]  Melody, who had been heading toward the front door, saw that David had Melinda on the floor with the computer between them.[21]  Melody walked over to where the couple was struggling over the laptop and hit David from behind to get him off of her daughter.[22]

What happened during the next few moments that night is the major source of disagreement between the parties and the core of this action.  Melody described it as follows:

> [Melinda] was on her back and the computer was between them. He was straddled across her, not letting her up, holding her down until he could get the laptop away from her.  But she was calling out stop, get off of me, stop, let - - leave me alone.  And I didn't know to what extent he could be hurting her.  So I walked over and, with my closed hand, twice, I went like that on his back and said get off of her.

> He then, as he was turning to his left, in the process of putting his - - from his knee to his foot and coming up, he took his right hand underneath and punched me in the jaw.  As he was turning around, he looked at me just with - - with his - - eyes were just so angry when he looked at me and came up and punched me.

> And then he grabbed, with his left hand, my shoulder and whipped me around, took both of his hands and hit me with those,

[18] Tr. 28:1-10 (Melody); Tr. 108:9-13 (David); Tr. 182:16-19 (Cassandra).
[19] Tr. 108:14-109:1 (David).
[20] Tr. 110:1-7 (David); Tr. 182:20-24 (Cassandra).
[21] Tr. 28:6-17 (Melody).
[22] Tr. 28:13-19 (Melody).

5

which propelled me across the kitchen. No[w] I don't remember going across the kitchen because I had a concussion and I was in and out.  I remember him hitting my back and like coming up a little bit off the floor, I think.[23]

David describes that moment differently, testifying:

A:     And the next thing I know, Ms. Olsen there comes across from the living room and then punches me in the back of the head.

Q:     And did she punch you just once?

A:     No, I think it was more than once.  And about that time, after the first time, I kind of went like and slugged around like that, and said what are you doing, like that. And my hand is still on the computer.  And then, when I turned around like that, her back turned from me and I watched her walk away from me. Then her feet touched together - - so she had these big boots on, and she tripped over her boots and fell on the floor and bumped her head like on the wall.[24]

Cassandra testified about that moment as follows:

Q:     And did anyone else intervene in that laptop struggle?

A:     I mean, yes.  I mean, [Melody] came and she started beating my dad on the back of the head to stop with the fighting.
And he turned around, like, to say, like Stop, or see what was happening and then she stumbled and fell.

Q:     When he turned around, did you notice where his arms were?

A:     I'm pretty sure he was still trying with the laptop.  I don't remember - - there was no, like, connection or anything.

…

Q:     And so, did you, at any time, see your father let the laptop go and punch your grandmother in the face?

A:     No, absolutely not.

…

Q:     Okay.  And so when your grandmother - - did you say she was pushed or tripped or what happened to her?

A:     She kind of, like was startled and just tripped over her own feet.

Q:     And what was she wearing on her feet, do you remember?

A:     Big, old UGG boots, like big, thick ones.

---

[23] Tr. 28:13-29:6. (Melody).
[24] Tr. 110:7-19. (David).

Q:   And so when she tripped, she did right herself?  Did she fall?
     What happened?
A:   I mean, she, like, just stumbled, stumbled, stumbled and then
     down.
Q:   And did she hit anything on the way, did you notice?
A:   Not that I'm aware of, no; just straight down.
Q:   Did she hit any walls or partitions or - -
A:   I think - - I don't think she did. I think she got close, like, she was
     close to the wall, but I don't think it actually hit.[25]

All parties agree that after Melody was injured, David picked her up off the floor,

placed her in a chair, and brought her ice wrapped in a towel.[26]

    2.   Events after the Incident

When Melody and Melinda left the house, they went directly to the Milford

Police Station, but the police suggested they go to the hospital.[27]  The police met

them at the hospital and interviewed them for a report about the incident.[28]

David testified that after Melinda and Melody left, a state trooper came to

the house and talked to Cassandra and him.[29]  During this first visit, the officer did

not say anything about charging David.[30]  However, the officer returned to the

house later and informed David that Melody wanted to press charges against

David because of her injuries.[31]  David said he and the officer talked at the house

for about 45 minutes.  At that point, the officer told David to follow him, in David's

own car, to the station where David was finger-printed and charged with two

counts of Assault Third (one against Melody and one against Melinda), and one

---

[25] Tr. 182:25-183:9; 185:8-10; 185:25-186:15. (Cassandra).
[26] Tr. 29:12-14 (Melody); Tr. 110:21-111:2 (David); Tr. 186:16-22 (Cassandra).
[27] Tr. 41:2-6 (Melody).
[28] Tr. 41:9-12 (Melody).
[29] Tr. 113:8-16 (David).
[30] Tr. 113:17-22 (David).
[31] Tr. 113:23-114 (David).

count of Disorderly Conduct.[32]  David was not tested for alcohol in his home or at the station.[33]

### 3.  Protection from Abuse Orders

Two days after the Incident, Melody went to the courthouse in Georgetown, Delaware to file a petition for a protection from abuse ("PFA") order against David.[34]  A few days later, David filed his own petition for a PFA order against Melody.[35]

On March 24, 2011, a PFA Order was entered in favor of Melody and against David that, among other things, noted that David had agreed to pay Melody's

---

[32] Tr. 114:9-115:3 (David). Stipulated Facts, Adv. Docket No. 44, ¶ 2. Assault Third is codified at 11 Del. C. § 611; Disorderly Conduct is codified at 11 Del. C. § 1301.

[33] Tr. 117:4-8 (David).  Melody testified that Melinda called Melody to come to the house and get her "because David came home drunk and beat her up." Tr. 18:4-23. Melody testified that when she got to the house, she smelled alcohol on David and his behavior indicated that he was drunk. Tr. 25:13-26:11 (Melody).  David, however, testified that he was not drunk.  When asked about the police report from that night which stated: "Upon arrival, the defendant, David Dingess, was emotionally upset to the point he threw up in the kitchen sink," David testified that he had not gotten sick because he was drunk, but "because my emotions were so high I was just - - just overwhelmed, I mean, sick to my stomach."  Tr. 119:10-16 (David).  Moreover, when asked if the police tested him for alcohol, David said, "No, they never even considered it an issue.  Like I said, I talked to the guy 45 minutes two different times sitting at my table at the house."  Tr. 117:4-8 (David).  Also, that night, because Melody wanted to file charges, the officer told David to follow him, in David's own car, to the police station where David was finger-printed, charged, and released to drive himself home. Tr. 114:9-115:3 (David). Weighing this competing testimony and considering the actions by the police that night, the Court concludes that the record does not support a finding that David was intoxicated.

[34] Tr. 31:25-32:2 (Melody).

[35] Defendant's Ex. 3 at B-1.  Tr. 127:1-23 (David).

medical and dental bills arising from the Incident.[36]  Also on that date, the parties stipulated to dismiss David's PFA petition.[37]

### 4.  The Criminal Proceeding

David was charged with two counts of Assault Third (one against Melody and one against Melinda), and one count of Disorderly Conduct.[38]  At an arraignment in Delaware Family Court Sussex County, David consented to a disorderly conduct charge and the State of Delaware agreed to dispose of the two counts of Assault Third by *nolle prosequi*.[39]

### 5.  The State Court Personal Injury Action

On February 21, 2013, Melody filed a civil action in the Superior Court of Delaware, Kent County, seeking money damages for personal injuries she sustained from the Incident (the "Civil Case").[40]  In the Civil Case, Melody alleged that David intentionally inflicted injuries to Melody during the Incident.[41]  David, through counsel, answered the Civil Case complaint and participated in discovery,

---

[36] Defendant's Ex. 3 at D-3.  Tr. 128:22-129:11 (David).  A dispute arose about whether David paid Melody's medical and dental bills as agreed.  Melody filed a contempt motion, and on July 7, 2011, the Family Court for the State of Delaware found David in contempt for failure to pay bills but noted that he purged the contempt by making a payment.  Defendant's Ex. 3 at G-1. Melody filed a second contempt motion, and on February 17, 2012, the Family Court again found David in contempt but noted that he also purged the second contempt by making the payments.  *Id.* at I-1.

[37] Defendant's Ex. 3 at D-9.

[38] Stipulated Facts, Adv. Docket No. 44, ¶ 2.  Assault Third is codified at 11 Del. C. § 611; Disorderly Conduct is codified at 11 Del. C. § 1301.  The charges are misdemeanors.  *Id.*

[39] Stipulated Facts, Adv. Docket No. 44, ¶ 4.

[40] Stipulated Facts, Adv. Docket No. 44, ¶ 5.  Melody testified that she suffered serious injuries from the Incident.  She had a concussion. Tr. 41:25-42:6. She required ten stitches insides her mouth to close the gash that opened when her teeth cut through under her lip. Tr. 35:16-22. She required extensive dental work. Tr. 35:23-36:14. She had back pain and a later MRI revealed three fractures to her back. Tr. 36:16-22. Melody's left shoulder was also injured in the Incident, requiring rotator cuff surgery. Tr. 38:15-23 (Melody).

[41] *Id.* ¶ 6.

with both parties exchanging interrogatories and documents.[42]  A jury trial was scheduled for April 14, 2014, but was cancelled due to the withdrawal of David's counsel.[43]

A hearing was scheduled for April 4, 2014 to discuss David's *pro se* status, but David failed to appear.[44]  David claims he did not receive notice of that hearing.[45]  On April 17, 2014, Melody filed a motion seeking default judgment.[46] After receiving no response from David, the Court granted the default judgment on May 23, 2014.[47]  David argues he did not receive notice of the default judgment motion.[48]

At Melody's request, the Superior Court held an inquisition hearing on July 24, 2014, and issued an Order (provided by Melody's counsel) for judgment in the total amount of $287,557.33 in favor of Melody and against David (the "State Court Judgment").[49]  The State Court Judgment provides in pertinent part that:

> The evidence established that on February 26, 2011, Defendant intentionally caused significant physical and emotional injury to Plaintiff, for which Defendant has previously been determined to have been liable.
>
> The injury Defendant caused to Plaintiff consisted of a concussion; severe damage to her mouth, jaw and dental structure; permanent left shoulder impairment, for which Plaintiff is confronting surgery later this month; substantial pain and suffering; and on-going uncompromising psychological impact.[50]

---

[42] *Id.* ¶ 7.

[43] *Id.*

[44] *Id.*

[45] *Id.*  Tr. 143:21-144:18 (David).

[46] Stipulated Facts, Adv. Docket No. 44, ¶ 7.

[47] *Id.*

[48] *Id.*

[49] Stipulated Facts, Adv. Docket No. 44, ¶ 7.

[50] Pl. Ex. 18.

The State Court Judgment's total damage award consisted of $12,557.33 in medical expenses, $262,557.33 in compensation for injuries, and $25,000 in punitive damages.[51]  David neither appeared for, nor participated in, the inquisition hearing.[52]  David claims he did not receive notice of the inquisition hearing.[53]

6. <u>The Bankruptcy</u>

David filed a Chapter 13 bankruptcy case on November 16, 2020, to stop actions to collect Melody's default judgment, among other issues.[54]  The Debtor's First Amended Plan was confirmed on a final basis on July 26, 2021.[55]  Melody did not object to the Plan or the treatment of her claim in the main case.[56]

Melody filed the adversary complaint to declare her claim nondischargeable under Bankruptcy Code §§ 523 and 1328.[57]  After lengthy motion practice, the trial on Melody's Amended Complaint was held and the Court took the matter under advisement.

<u>JURISDICTION</u>

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy

---

[51] *Id.*
[52] Stipulated Facts, Adv. Docket No. 44, ¶ 7.
[53] *Id.*
[54] Stipulated Facts, Adv. Docket No. 44, ¶ 20.
[55] Stipulated Facts, Adv. Docket No. 44, ¶ 19.   Main Case Docket No. 35.
[56] Stipulated Facts, Adv. Docket No. 44, ¶ 19.
[57] Stipulated Facts, Adv. Docket No. 44, ¶ 9.  As discussed, *infra.*, because the debt falls within the requirements of § 1328(a)(4) and because it is easier to except debts from discharge under § 1328(a)(4) than § 523(a), this Court will primarily review the discharge exception under § 1328(a)(4).

Procedure. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 157 and § 1334. This matter to determine the dischargeability of a claim is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).[58]

## DISCUSSION

(1)    Collateral Estoppel

Determining whether Melody's claim is nondischargeable under § 1328(a)(4) requires consideration of whether the claim is the result of a willful or malicious injury by David. Melody first argues that David is collaterally estopped from relitigating the willfulness of his actions that injured her since the State Court Judgment stated:

> [t]he evidence established that on February 26, 2011, Defendant *intentionally* caused significant physical and emotional injury to Plaintiff for which the Defendant has previously been determined to have been liable."[59]

Because the Superior Court expressly stated that David "intentionally" injured Melody, she argues that the question of willfulness has been conclusively determined and may not be relitigated here.

"The principles of collateral estoppel apply in discharge proceedings in bankruptcy court."[60]  "[When] a party seeks to rely on a state court judgment to

---

[58] Issues about the dischargeability of debts is within the exclusive jurisdiction of the bankruptcy courts. *Graham v. Internal Revenue Service (In re Graham)*, 973 F.2d 1089, 1096-97 (3d Cir. 1992).

[59] Pl. Ex. 18 (emphasis added).

[60] *Crowe v. Moran (In re Moran)*, 413 B.R. 168, 180 (Bankr. D. Del. 2009) (citing *Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 214 (3d Cir. 1997.  "[J]udicial proceedings … shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State … from which they are taken." *Id.* (quoting 28 U.S.C. § 1738)).

preclude relitigation of the same issues in federal court, a federal court must look to state law and its assessment of the collateral estoppel doctrine to determine the extent to which the state would give its own judgment collateral estoppel effect."[61] Since the State Court Judgment was entered by the Superior Court of Delaware, the Court will review Delaware law.

When analyzing collateral estoppel, Delaware state courts consider whether:

(1)    The issue previously decided is identical to the one presented in the action in question;

(2)    The prior action has been finally adjudicated on the merits;

(3)    The party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and

(4)    The party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[62]

It is undisputed that the State Court Judgment against David was entered by default.[63]  Although he participated in discovery early in the case, David's counsel withdrew prior to trial and no trial was ever held. As noted, David claims he did not receive notice of the hearings prior to the entry of the default judgment.

Delaware courts have held that issues raised in a proceeding determined by default judgment are "not actually litigated and determined … and, therefore, the prior judgment is not conclusive and binding upon the parties as to those issues in … a different cause of action."[64]  Therefore, "an issue raised in a proceeding which

---

[61] *Moran*, 413 B.R. at 181 (citing *Bailey v. Ness*, 733 F.2d 279, 281 (3d Cir. 1984)).

[62] *Moran*, 413 B.R. at 181 (citing *Betts v. Townsends, Inc.*, 765 A.2d 531, (Del. 2000)). *See also Van Reenan v. Sieber*, 2024 WL 4533450, *6 (C.C.P. Del. Oct. 10, 2024) (same).

[63] Stipulated Facts, Adv. Docket No. 44, ¶ 7.

[64] *Moran*, 413 B.R. at 181 (quoting *Petrucci v. Landon*, 107 A.2d 236, 239 (Del. Super. Ct. 1954)). *See also Patterson v. Shahan*, 1995 WL 108925, *2 (Del. Super. Ct. Jan. 31, 1995) ("In Delaware, the rule of collateral estoppel applies only when the fact sought to be established in the second proceeding has been actually litigated and determined in the first proceeding.").

was eventually decided by default can be relitigated in a subsequent proceeding."[65]

Accordingly, collateral estoppel does not prevent this Court from hearing and

deciding the issues of whether the injuries were "willful or malicious" under

§ 1328(a)(4) because those issues were not "actually litigated" in the state court

proceeding that resulted in default judgment.

(2)    Standard – § 1328(a)(4) nondischargeability

"Generally, a Chapter 13 debtor receives a discharge of 'all debts provided

for by the plan or disallowed under section 502' upon the completion of all plan

payments."[66]    Bankruptcy Code sections 523(a) and 1328(a) set forth exceptions to

the general rule for discharging debts. "Exceptions to discharge are construed

strictly against creditors and liberally in favor of debtors."[67]

At issue here is § 1328(a)(4), which excepts from discharge:

> any debt … for restitution, or damages, awarded in a civil action
> against a debtor as a result of willful or malicious injury by the debtor

---

[65] *State v. Manchin*, 642 A.2d 1235, 1240 (Del. Super. Ct. 1993).  Melody argues that, despite
being a default judgment, the State Court Judgment was a final adjudication of the merits.  She
relies on the case *Universal Music Investments, Inc. v. Exigen, Ltd.*  That case involved an action
against a guarantor (Exigen, Ltd.) on a debt which was determined by a default judgment against
the primary obligor (Exigen USA) in a previous breach of contact action.  The Superior Court in
*Universal Music* determined that principles of *res judicata* prevented the guarantor from raising
affirmative defenses and counterclaims to the underlying debt in a subsequent action to enforce the
guaranty. *Universal Music Inv., Inc. v. Exigen, Ltd.*, 2014 WL 4954663, *4 (Del. Super. Ct. Aug. 25,
2014).  Although Melody argues that the facts of *Universal Music* are similar to this case (*i.e.*, the
parties engaged in discovery prior to defendant's counsel withdrawing and entry of default
judgment), the *Universal Music* court noted that those parties engaged in three years of discovery
and motion practice before Exigen USA's counsel withdrew, and Exigen USA was given the
opportunity to engage a second, then third, set of counsel before "as a last resort and after fair
warning, the court granted default judgment and dismissed the counterclaims."  *Id.* at *1.    The
facts of that case are distinguishable from the matter now before the Court, especially in light of the
questions regarding whether David received notice of the default hearings.

[66] *Ortiz v. Ovalles (In re Ovalles)*, 619 B.R. 23, 29 (Bankr. D. P.R. 2020) (quoting 11 U.S.C. §
1328(a)).  *See also* 8 COLLIER ON BANKRUPTCY ¶ 1328.02 (16th ed. 2025).

[67] *Menges v. Collins (In re Collins)*, 633 B.R. 700, 707 (Bankr. E.D. Pa. 2021) (quoting
*Carmelo v. Mickletz (In e Mickletz)*, 544 B.R. 804, 812 (Bankr. E.D. Pa. 2016)).

that caused personal injury to an individual or the death of an individual."[68]

Section 1328(a)(4) differs from the nondischargeable "willful and malicious injury" of § 523(a)(6) in two ways.  First, § 1328(a)(4) narrows the types of debts that may fall within the dischargeability exception.  Section 523(a)(6) applies to any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity."[69] Section 1328, however, is limited to debts based on the following three elements:

(i)    restitution or damages, awarded in a civil action against the debtor,[70]
(ii)   as a result of willful or malicious injury by the debtor,
(iii)  that caused personal injury to an individual or the death of an individual.[71]

Second, courts have determined that § 1328(a)(4) is less restrictive than § 523(a)(6) because it requires that the injury be either willful *or* malicious.  As one Court noted:

> "[U]nlike § 523(a)(6)'s more stringent conjunctive standard, § 1328(a)(4) requires a plaintiff to show that [a] debtor's actions were willful _or_ malicious.  Only one need be proven, not both as required by § 523(a)(6)."[72]

---

[68] 11 U.S.C. § 1328(a)(4).  This exception to discharge was added to the Bankruptcy Code in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BACPA").  *In re Grosso*, 512 B.R. 768, 771 (Bankr. D. Del. 2014).

[69] 11 U.S.C. § 523(a)(6).

[70] However, this Court previously concluded that a claim for liability that has not been reduced to a judgment *at the time a debtor files a bankruptcy petition* may nevertheless be excepted from discharge under § 1328(a)(4).  *K.C. v. Grosso (In re Grosso)*, 512 B.R. 768, 773 (Bankr. D. Del. 2014).

[71] 11 U.S.C. § 1328(a)(4).

[72] *Michael v. Denson (In re Denson)*, 2020 WL 1547493, *3 (Bankr. S.D. Ind. Mar. 30, 2020).  *See also Seubert v. Deluty (In re Deluty)*, 540 B.R. 41, 48 (Bankr. E.D.N.Y. 2015).  *See also* 8 COLLIER ON BANKRUPTCY ¶ 1328.02[3][k] (16th ed. 2025).

In this case, it is undisputed that Melody's claim is for personal injuries in an amount awarded in a civil action before a state court judge. The crux of the issue here is whether David acted in a willful or malicious manner which caused Melody's injuries. To succeed on her nondischargeability claim, Melody bears the burden of proving by a preponderance of the evidence that the injuries caused by David were either willful or malicious.[73] Neither "willful" nor "malicious" are defined by the Code, but courts construing § 1328(a)(4) have looked to the more extensive case law interpreting those terms under § 523(a)(6) for guidance.[74]

(3)   <u>Willful</u>

A "willful" injury requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[75] "Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'"[76] "Actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury are 'willful'" under the Code's nondischargeability provisions.[77] Debts arising from recklessly or negligently inflicted injuries are not "willful" under the Code.[78]

In the case at bar, all three witnesses testified about the events leading up to the Incident. The Court notes that whether David's actions which resulted in

---

[73] *Ovalles*, 619 B.R. at 29; *Denson*, 2020 WL 1547493 at*2. *See also Collins*, 633 B.R. at 707.

[74] *Ovalles*, 619 B.R. at 30. *See also* 4 COLLIER ON BANKRUPTCY ¶523.12[2] (16th ed. 2025).

[75] *Ovalles*, 619 B.R. at 30 (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)).

[76] *Ovalles*, 619 B.R. at 30 (quoting *Kawaauhau*, 523 U.S. at 61).

[77] *Collins*, 633 B.R. at 707-08 (quoting *Beard Research, Inc. v. Kates (In re Kates)*, 485 B.R. 86, 100 (Bankr. E.D. Pa. 2012)).

[78] *Collins*, 633 B.R. at 708 (quoting *Kates*, 485 B.R. at 100)).

Melody's injuries were willful depends upon events occurring in a very short window of time - - a few seconds, really - - when David and his wife were struggling over the laptop.  The Court finds that, perhaps unsurprisingly, it is difficult for the witnesses to consistently recollect exactly what occurred in February 2011 without the benefit of hindsight and their own motivations on how to interpret those events.  The testimony, however, is corroborated with documents, including a police report, that were created close to the time of the Incident.[79]  The Court finds that the combination of testimony and documentary evidence gives the Court a sufficient basis to determine the necessary facts to address the legal issues underlying the dischargeability analysis.

Considering the entirety of the record, the Court notes that all witnesses agree that at the key moment, David and Melinda were engaged in a physical struggle over the laptop, then Melinda fell and David was standing over her, each still trying to wrest away the laptop.  This frightened Melody, who began to hit David on his back (or the back of his head), attempting to let Melinda get up.  Instead, Melody's blows induced David, still attempting to take control of the laptop, to turn quickly and with some force, to confront Melody who was punching him.  While turning, David knocked into Melody which caused her to fall into the wall, hit her head and sustain her injuries. The Court finds that the testimony does

---

[79] In the Police Report, the officer who interviewed David wrote: "He [David] stated he did not hit either one however he did see his wife, Melinda, fall as they tussled for the laptop.  He also stated he may have bumped into his mother in law Melody and she just fell into the wall.  But he went on to say "I helped her back up once she fell," "I did not mean to knock her down I am just big."  Defendant Ex. 2.

not support a finding that David punched or pushed Melody with his hands, which in that moment were still attempting to gain control of the laptop. There is nothing in the testimony indicating that there had been any words exchanged or argument between David and Melody prior to the moment of contact. Instead, his focus had been solely on Melinda and the laptop, and he was reacting entirely to an unexpected blow from behind.

At the point when Melody fell, David and Melinda immediately stopped the struggle over the laptop, and David quickly turned to help Melody. With the adults no longer focused on the laptop, Cassandra retrieved it and took it back to her bedroom. David picked Melody up and placed her on a counter bar stool and then retrieved ice and a towel for her face. As soon as she felt able, Melody instructed Melinda to grab the car keys so they could leave the property.

Even with inconsistencies among the parties' versions of the events, the Court finds an important consistency within all the testimony: at the time that Melody was injured, David was focused on wresting laptop away from Melinda. In response to the punches on the back of his head, David turned toward Melody, but the evidence is not sufficient to support the finding that he turned with a specific intent to injure Melody. Given his size, he may have acted recklessly or negligently. However, the Court cannot find that David intended that the consequence of his turning to confront Melody would cause her injury. The Court thus does not find that he acted willfully or with specific intent to cause injury to Melody.

(4) <u>Malice</u>

"Malice" has been defined as "actions that are wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will."[80]  Some courts determine "malice" by reviewing the totality of the circumstances to identify "aggravating circumstances to warrant the denial of a discharge."[81]  "[T]he 'wrongfulness' component of malice serves as one of the safeguards against misuse of the Bankruptcy Code[,]"[82] and the analysis should be considered with the fundamental policy underlying the bankruptcy discharge: of providing a fresh start only to the "honest but unfortunate debtor."[83]

Upon consideration of the record as discussed above, there do not appear to be any aggravating circumstances leading the Court to determine that David acted with malice when he turned and knocked Melody into the wall, causing her injuries.  In another case, a court determined that a defendant acted with malice when that defendant's attack from behind was "unprovoked, without cause or excuse, and completely unjustified."[84]  Here, David was engaged in a struggle with his wife when Melody (perhaps understandably trying to protect her daughter)

---

[80] *Collins*, 633 B.R. at 708 (citing *Kates*, 485 B.R. at 101)). "[F]or a tortious act to rise to the level of maliciousness – it must be (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse."  *Bounds v. Mullins (In re Mullins)*, 2017 WL 3705071, *3 (Bankr. D. Del. Aug. 24, 2017) (quoting *In re Sicroff*, 401 F.3d 1101, 1106 (9th Cir. 2005)).

[81] *Ovalles*, 619 B.R. at 31 (quoting *Forrest v. Bressler (In re Bressler)*, 387 B.R. 446, 455 (Bankr. S.D.N.Y. 2008)); "[T]he element of malice may be found either upon a finding of actual malevolence or ill will, or upon a finding of aggravated, socially reprehensible conduct sufficient to justify an imputation of malice to the debtor."  *Bressler*, 387 B.R. at 454-55 (quoting *Bundy Am. Corp. v. Blankfort (In re Blankfort)*, 217 B.R. 138, 146 (Bankr. S.D.N.Y. 1998)).

[82] *Viener v. Jacobs (In re Jacobs)*, 381 B.R. 128, 139 (Bankr. E.D. Pa. 2008).

[83] *Id.* (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (internal punctuation omitted)).

[84] *Collins*, 633 B.R. at 710.

began to hit David from behind.  It follows that David would turn to confront

Melody, even if he recklessly and negligently turned and knocked her into the wall.

Unfortunately, Melody sustained serious injuries as a result of the Incident.

However, like the foregoing willfulness analysis, the evidence here is not sufficient

for the Court to find that David's actions were done with malice.[85]

## CONCLUSION

For the reasons set forth above, the Court concludes that David did not act

in a willful or malicious manner to cause injury to Melody.  Therefore, Melody's

claim does not fall within the exceptions to discharge under either Bankruptcy

Code § 523(a)(6) or § 1328(a)(4).  Melody's claim against David may be discharged.

An appropriate Order will be entered.

FOR THE COURT:


BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE


Dated:  May 14, 2025

---

[85] *Ovalles*, 619 B.R. at 34 ("[M]alice requires 'an intent to cause the harm, and the fact that the injury was caused through negligence or recklessness does not satisfy that standard of proof.'") (quoting *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997)).